## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CARLOS TERAN, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>GB INTERNATIONAL, S.P.A., )<br>GB MIAMI, S.R.L., and )<br>AMERICAN CRANE & TRACTOR )<br>PARTS, INC., )<br>)<br>Defendants. )<br>_____ ) | Case No. 11-2236-JAR |

### MEMORANDUM AND ORDER

Plaintiff Carlos Teran brings this lawsuit against GB International, S.P.A. ("GB International") and GB Miami, S.R.L. ("GB Miami"), and American Crane & Tractor Parts, Inc. ("ACTP") (collectively "Defendants"), asserting derivative tort claims and individual capacity claims for declaratory relief and breach of contract. Defendant GB Miami also asserts a counterclaim for declaratory relief. This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 124) and Plaintiff's Motion for Extension of Discovery Deadline (Doc. 156). The Court directed further briefing under Fed. R. Civ. P. 56(f)(2) on why summary judgment should not be granted on Plaintiff's affirmative defenses to Defendant's counterclaim (Doc. 160). The parties have filed supplemental briefs (Docs. 163, 164) and the Court is prepared to rule. For the reasons explained in detail below, the Court grants Defendants' motion and denies Plaintiff's motion as moot.[1]

---

[1] Plaintiff seeks additional time to conduct discovery on issues including damages, which Defendants oppose. Docs. 157, 159. He does not seek relief under Fed. R. Civ. P. 56(d), which permits the court to defer or deny summary judgment because additional discovery will produce material that precludes summary judgment.

# I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[3]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[4]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[5]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[6]  Where the movant bears the burden of proof on a claim or defense, it must show that the undisputed facts establish every element of the claim entitling it to judgment as a matter of law.[7]  If the moving party properly supports its motion, the burden shifts to the non-moving party, "who may not rest upon the mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."[8]  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or

---

[2]Fed. R. Civ. P. 56(a).

[3]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4]*Id.*

[5]*Id.* at 251–52.

[6]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[7]*See id.* at 331 (Brennan, J., dissenting) ("If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c) that would entitle it to a directed verdict if not controverted at trial.").

[8]*Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir. 1993).

specific exhibits incorporated therein."[9]  If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted.[10]  A party opposing summary judgment "cannot rely on ignorance of the facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."[11]  Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts."[12]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]

## II.    Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff, the non-moving party.

Plaintiff Carlos Teran owned and operated a tractor part supply company, Teran Tractor. On January 9, 2004, ACTP entered into a supply agreement with GB International that requires ACTP to purchase certain products from GB International.  At that time, GB International acquired a controlling share in ACTP.  In April 2005, GB International acquired a controlling share in Teran Tractor.  GB International also owned other tractor part supply companies, including CGR.

---

[9]*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[10]*Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994).

[11]*Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1998).

[12]*Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

[13]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

3

In November 2006, Teran Tractor and ACTP were merged and began operating under ACTP's name.  At the time of the merger, GB International gave itself the right to redeem 692.723 of its shares of ACTP for $4.2 million; Teran was not permitted to redeem his shares for cash.  During the time that Teran worked for ACTP, GB International held a majority of the seats on ACTP's board of directors.

On November 9, 2006, Teran signed the Second Amended and Restated Shareholders Agreement (the "Shareholders Agreement"), an agreement among ACTP, GB International, GB Miami, Teran, and three other individuals, Jeffrey Weiner, Harry Pennington, and Kenneth Stacy who were Continuing Shareholders in ACTP.[14]  As Continuing Shareholders, Weiner, Pennington, and Stacy had employment agreements with ACTP and were responsible for the management and day to day operations of the Company.[15]

Section 1.3 of the Shareholders Agreement states:

> Decision of the Board.  Each of the following decisions shall require the consent of the Board of Directors and the approval of the Continuing Shareholders (in accordance with Section 5.13 of this Agreement) (the "Approval Rights"): . . .
> (b) Any amendment or modification by the Company of the Supply Agreement (as defined in the Stock Purchase Agreement).[16]

The Shareholders Agreement states in Section 2.9(B)(d):

> If the Company [ACTP] terminates the employment of Carlos [Teran] within ten (10) years of April 29, 2005 'with cause' (as defined in Section 5(d) of the Carlos Employment Agreement) or if Carlos terminates the Carlos Employment Agreement under paragraph 5(a) of such agreement within ten (10) years of April 29,

---

[14]Doc. 125, Ex. B.

[15]*Id*. at 1–2.

[16]*Id*. at 4.

2005, then, in each case, GB Miami shall have a call right, exercisable immediately, and continuing thereafter, for a total purchase price of One Dollar ($1.00) for all of Carlos' ownership in the Company; provided,, however, that, if Carlos' employment is terminated "for cause" under Section 5(d)(iii) (conviction of a felony as governed by Section 5(d) of the Carlos Employment Agreement) of the Carlos Employment Agreement after the fifth (5th) anniversary of the date hereof and such felony does not result in any material damage to the Company, then, GB Miami shall have a call right at forty percent (40%) of the Put Valuation Price. Carlos hereby irrevocably agrees that such provision is fair and reasonable in light of such circumstances.[17]

On November 9, 2006, Teran signed and initialed each page of the "Carlos Employment Agreement" referenced in the Shareholders Agreement, under which he served as ACTP's Managing Director of Latin American markets.[18]  The term of the Carlos Employment Agreement was until April 30, 2015.  Paragraph 5(a) of the Carlos Employment Agreement states:

Termination.  Employee's employment by the Company under this Agreement shall be terminated upon the earliest to occur in the following events:
(a) Termination by Employee.  Employee's resignation or other voluntary departure, in which case, he will no longer serve as an 'employee' or represent the Company from the date of such resignation or ceasing of services. . . .[19]

The Put Valuation Price is defined under the Shareholders Agreement as "eighty-five percent (85%) of the Future Valuation Price.[20]  The Future Valuation Price is defined under the Agreement as Teran's "pro rata ownership of the Shares of the Company as of the applicable

---

[17]*Id.*, Ex. B at 15 (emphasis in original).

[18]*Id.*, Ex. C.

[19]*Id.* ¶ 5(a).

[20]*Id.*, Ex. B at § 2.9(B)(a).

date multiplied by the Equity Value of the Company as of such date.[21]   The Future Valuation

Price applied to Stacy's shares was his pro rata ownership of shares as of the date of the Second

Shareholders Agreement multiplied by thirty-five (35%) percent of the Equity Value of ACTP as

of the applicable date.[22]   The Call Valuation Price for Weiner's minimum value was defined as

$5,295,375 if prior to his first put right, and $2,500,000 if after the exercise of his first put

right.[23]   The minimum value for Pennington's shares was defined as either $2,287,121 or

$2,058,414, depending on when the Call Right was exercised.[24] GB International shares are not

subject to a Call Right under the Shareholders Agreement.

In a letter dated July 25, 2010, from Teran to ACTP, he stated that it was his "intention to

sever [his] employment relationship with the Company effective at the end of the business day

on October 29, 2010."[25]   At the time Teran wrote the letter, the only employment he had with

ACTP was under the Carlos Employment Agreement.

In response to Teran's letter, ACTP sent a letter dated August 5, 2010, in which it told

Teran that his "resignation effective as of the end of the business day on October 29, 2010 is

accepted by the Company."[26]   In the August 5 letter, ACTP further explained that Teran's

resignation triggered rights under the Shareholder Agreement, including GB Miami's right to

---

[21]*Id.*

[22]*Id.* § 2.9A(a).

[23]*Id.* § 2.9A(b)(ii)(X).

[24]*Id.* § 2.9A(b)(ii)(Y).

[25]*Id.*, Ex. D.

[26]*Id.*, Ex. E.

purchase all of Teran's ownership in ACTP for the price of $1.00.[27]  Teran testified that he did

not pay attention to the part of the letter where ACTP explained that his resignation under the

Carlos Employment Agreement effectuated the trigger of the $1.00 Call Right, and that he

thought it was "just a formality."[28]

By letter agreement dated October 29, 2010, ACTP extended an offer of employment to

Teran, which stated that his employment would begin on November 1, 2010.[29]  The letter further

stated that Section 9 of the former [Carlos] Employment Agreement, the non-compete provision,

will apply and continue in full force and effect.  The employment was to be "at will," and ended

by stating that Teran had until the end of the business day on October 29, 2010 to accept the

offer.  Teran accepted the offer and signed the letter agreement that date, and began the effective

date of a new term of employment with ACTP three days later, on November 1, 2010.[30]

By letter dated December 1, 2010, ACTP informed Teran that GB Miami had exercised

its Call Right under Section 2.9(B)(d) of the Shareholders Agreement and ACTP requested that

Teran complete the closing of the sale by returning Teran's ACTP stock certificates.[31]  Along

with the December 1 letter, ACTP tendered to Teran the $1.00 payment amount called for in the

Shareholders Agreement.[32]  Teran refused to deliver the stock certificates, and on or about

December 10, 2010, ACTP cancelled Teran's stock certificates and recorded the shares as

---

[27]*Id.*

[28]*Id.*, Ex. A, Teran Dep., 44:1–15.

[29]Doc. 138-5, Ex. E.

[30]*Id.*

[31]Doc. 125, Ex. F.

[32]*Id.*, Ex. G.

transferred to GB Miami on ACTP's books.  Teran subsequently terminated the new

employment agreement with ACTP effective December 23, 2010.

The Shareholders Agreement also states in Section 2.9(B)(e):

> Beginning on the eighth (8th) anniversary of April 29, 2005, and
> continuing indefinitely thereafter, GB Miami shall have the right,
> but not the obligation, to require [Teran] to sell all, but not less
> than all, of the shares owned by him (a "Call Right") to GB Miami
> for a price equal to the Call Valuation Price. . . .

Although GB Miami and ACTP agree that GB Miami's exercise of its first Call Right was

proper, "out of an abundance of caution," on May 24, 2013, GB Miami executed a formal notice

that it was exercising its Call Right pursuant to Section 2.9(B)(e) of the Shareholders Agreement.

On May 29, 2013, ACTP sent Teran a letter enclosing the exercise notice from GB Miami

explaining that GB Miami was exercising its Call Right to purchase all of Teran's shares for the

"Call Valuation Price."  Both the letter and the exercise notice explained that the Call Valuation

Price, as determined by the financial information provided by ACTP's auditor, was zero

dollars.[33]  Teran does not contest that the Call Valuation Price for his ACTP stock is zero.[34]

## III.    Discussion

Plaintiff asserts five counts in his Second Amended Complaint.  Counts I and II are tort

claims that are asserted derivatively on behalf of ACTP, and stem from allegations that

Defendants GB International and GB Miami, as majority shareholders of ACTP, harmed the

company through their alleged control of ACTP's decision making.  Counts III and IV, which

Plaintiff asserts in his individual capacity, both relate to GB Miami's exercise of its right to

---

[33]*Id.*, Exs. K, M.

[34]*Id.*, Ex. A, Teran Dep. 247:7–12; 248:11–250:13.

purchase all of Plaintiff's ACTP stock pursuant to its Call Right in Section 2.9(B)(d) of the Shareholder Agreement.  Count V is a breach of contract claim asserted in Plaintiff's individual capacity.  Defendants move for summary judgment on all five counts.  Defendant GB Miami also moves for summary judgment on its counterclaim for declaratory relief, seeking a declaration that GB Miami properly exercised its Call Right under Section 2.9(B)(d) of the Shareholders Agreement and that Teran ceased to own any shares in ACTP when it tendered the $1.00 purchase price; and alternatively, that it properly exercised its second Call Right under Section 2.9(B)(e) of the Agreement; GB Miami also seeks attorney's fees and costs of enforcing its contract rights.

Because Teran's status as a shareholder affects his standing to bring the derivative claims, the Court will first address Counts III and IV and GB Miami's counterclaim.

### A.      Counts III and IV—GB Miami Call Right

In Count III, Teran seeks a declaration that GB Miami did not have the right to purchase all of his shares in ACTP for $1.00 under Section 2.9(B)(d) of the Shareholders Agreement. Alternatively, in Count IV, Teran claims that GB Miami breached the Shareholders Agreement by exercising the Call Right when it did not have the right to do so.

The Shareholders Agreement states that Kansas law governs, and the parties agree that Kansas law applies.  Generally, under Kansas law, if the language of a written contract "is clear and can be carried out as written, there is no room for rules of construction.  To be ambiguous, a contract must contain provisions of language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."[35]  "'In considering a contract which is

---

[35]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms.'"[36]  "'The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow.'"[37] "Where a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parole evidence."[38] Even if the parties' interpretation of the contract differ, the court need not resort to parole evidence to interpret the contract meaning if the contract is complete and unambiguous.[39]

Here, the dispute between the parties' interpretation of the unambiguous contract surrounds Section 2.9(B)(d) of the Shareholder Agreement and the letter agreement setting forth Teran's November 1, 2010 employment with ACTP.  Under the Shareholders Agreement, if the Call Right was triggered, GB Miami was entitled to exercise the Call Right by tendering an exercise notice and $1.00 to Teran.  That triggering event, Defendants urge, is Teran's resignation, which they contend was effective October 29, 2010.  It is undisputed that Teran wrote to ACTP on July 25, 2010 and stated his "intention to sever [his] employment relationship" under the Carlos Employment Agreement effective October 29, 2010, and that ACTP accepted that resignation to become effective October 29, 2010.  On the effective date of his resignation, Teran entered into a letter agreement with ACTP that set out terms for a new, at

---

[36]*Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 858 P.2d 1228, 1238 (Kan. Ct. App. 1993)).

[37]*Kay-Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (quoting *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996)).

[38]*Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[39]*See Decatur Cnty. Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 575 (Kan. 1999)).

will employment arrangement, with a start date of November 1, 2010.  Nevertheless, Teran

argues that as a result of his new employment arrangement, his resignation from the Carlos

Employment Agreement did not become effective October 29, 2010, because that agreement was

superseded by the new employment agreement.  Teran further contends that his employment

under the Carlos Employment Agreement did not terminate, because he and ACTP mutually

agreed that he would continue to work for ACTP under a new employment agreement.

By applying the principles used to interpret contracts under Kansas law, the Court finds

that Defendants' interpretation is correct.  ACTP formalized the end of Teran's employment

under the Carlos Employment Agreement on October 29, 2010, thus triggering GB Miami's Call

Right; the letter agreement setting forth the terms of his November 1, 2010 employment with

ACTP clearly and unambiguously was a new contract of employment.  Teran's interpretation of

the letter agreement would require the Court to read terms into the agreement, specifically: that

his previously-accepted resignation from the Carlos Employment Agreement was undone, and

that his employment with ACTP would continue uninterrupted, but replaced by the terms of the

letter agreement.  But the letter agreement makes no mention of these terms and the Court will

not read the contract to have the effect Teran claims it has.  "When the terms of the contract are

plain and unambiguous the meaning must be determined by its contents alone and words cannot

be read into the agreement which import an intent wholly unexpressed when it was executed."[40]

The Court declines to rewrite the letter agreement to undo or supersede Teran's resignation from

the Carlos Employment Agreement.

Moreover, the language in the letter agreement supports Defendants' interpretation.

---

[40]*Wood v. Hatcher*, 428 P.2d 799, 804 (Kan. 1967).

Consistent with Teran's resignation having become effective October 29, 2010, the plain language of the letter agreement states that Teran's "employment will begin on November 1, 2010," three days after the date the letter was executed.  Similarly, the letter states that ACTP was "pleased to extend the following offer of employment" to Teran.  And, the letter agreement refers to the Carlos Employment Agreement as the "former" employment agreement between Teran and ACTP.  Accordingly, the Court need not look any further than the plain terms of the letter agreement to conclude that Teran's employment under the Carlos Employment Agreement ended on October 29, 2010, that a new employment agreement began on November 1, 2010, and that Teran's resignation triggered GB Miami's Call Right.  Indeed, Teran conceded as much during his deposition, but stated that he did not understand it at the time he entered the agreement, and did not pay attention to the terms of the agreement as he thought it was "just a formality."  Kansas law is clear, however, that "[i]n the absence of fraud, mistake, or duress, a party who has fairly and voluntarily entered into such a contract is bound by its terms, regardless of the party's failure to read the contract or the inclusion of any terms in it which may be disadvantageous to that party."[41]

Accordingly, the undisputed facts show that because Teran resigned from the Carlos Employment Agreement effective October 29, 2010, GB Miami's Call Right to purchase his shares in ACTP for $1.00 was triggered.[42]  Defendants are granted summary judgment on Counts III and IV.

---

[41]*Adams v. John Deere Co.*, 774 P.2d 355, Syl. ¶ 3 (Kan. Ct. App. 1989).

[42]It appears Plaintiff has dropped any claim that GB Miami was required to be a shareholder of ACTP in October 2010 in order to exercise its Call Right under the Shareholders Agreement.  It is undisputed that GB Miami has been a shareholder of ACTP at all times from 2006 to date.  Doc. 129, SOF ¶ 18.

**B.      GB Miami's Counterclaim/Plaintiff's Affirmative Defenses**

This does not end the matter, however, as GB Miami also moves for summary judgment on its counterclaim, seeking a declaration that GB Miami properly exercised its Call Right under Section 2.9(B)(d) of the Shareholders Agreement and that Teran ceased to own any shares in ACTP when it tendered the contractually-mandated $1.00 purchase price to Teran on December 1, 2010.  Teran asserts four affirmative defenses to the counterclaim: 1) the Call Right provision is unconscionable; 2) prior breach of the Shareholders Agreement; 3) the unclean hands doctrine; and 4) waiver.

As an initial matter, the Court addresses Teran's argument that Missouri law should apply to GB Miami's counterclaim and his affirmative defenses.  As Teran notes, the Court previously ruled that Teran's claims for breach of fiduciary duty and tortious interference with business relationships are governed by Missouri law because they raise issues regarding the corporate governance of a Missouri corporation, ACTP.[43]  Likewise, Teran argues that because the Call Right at issue was triggered as a result of improper governance of ACTP, Missouri, not Kansas law, should apply.  The parties have agreed in the Pretrial Order, however, that GB Miami's counterclaim is governed by Kansas law because the Shareholders Agreement states that it shall be governed by and construed in accordance with Kansas law.[44]

Even if the parties had not already agreed, choice-of-law rules dictate that Kansas law applies.  A federal court sitting in diversity jurisdiction should apply the choice-of-law rules of

---

[43]Doc. 73 at 13.

[44]Doc. 155 at 3, ¶ 5.  Indeed, Teran cites to Kansas law regarding unconscionability in his initial response brief, and case law from multiple jurisdictions with respect to his remaining affirmative defenses.  Doc. 138 at 10–13.

the state in which it is located.[45]  "Where the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement."[46]  Here, GB Miami's counterclaim for declaratory judgment and Teran's affirmative defenses center on enforcement of the Shareholders Agreement, and those claims are controlled by the law chosen by the parties to the Shareholders Agreement—Kansas law.

### 1.      Unconscionability

 In order to be legally unconscionable, a contract must be so outrageous and unfair in its wording or application that it shocks the conscience or is so one-sided that no reasonable person would view it as just.[47]  In the absence of proof of fraud, mistake, or duress, a party is bound by the contracts he signs—even if the contract's provisions are disadvantageous to him or he failed to read it.[48]  The question of unconscionability is a question of law.[49]

Neither of Teran's initially alleged grounds support a finding of unconscionability. Teran relies on Section 2.9(B)(d) of the Shareholders Agreement, which gives GB Miami a Call Right to purchase Teran's shares if he is terminated for cause if he is convicted of a felony that does not materially damage ACTP.  Teran argues that this felony Call Right provision would yield a higher purchase price than the $1.00 Call Right that GB Miami exercised, which he

---

[45]*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

[46]*Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 375 (Kan. 2002).

[47]*Stormont-Vail Hosp. v. Spurling*, 331 P.3d 834 (Table) (Kan. Ct. App. 2014) (citing *Gonzalez v. Assoc. Fin. Serv. Co. of Kan.*, 967 P.2d 312, 324 (Kan. 1998)) (internal citations omitted).

[48]*Id*. (citing *Adams v. John Deere Co.*, 774 P.2d 355, 358 (Kan. Ct. App. 1989)).

[49]*Adams*, 774 P.2d at 359.

characterizes as "grossly unfair and unreasonably favorable to GB Miami."  Similarly, Teran alleges that his shares were formerly worth "millions," while the Shareholders Agreement set forth a purchase price of $1.00 for GB Miami's Call Right.  The Court finds nothing shocking or unfair about the fact that ACTP's shareholders contracted to incentivize Teran from leaving the company to a greater extent than they contracted to incentivize him to refrain from committing a felony.  As Defendants point out, the Call Right was not inevitable—Teran could have kept his shares and avoided exercise of the right by continuing to work for ACTP under the Carlos Agreement until April 2015.  Moreover, Section 2.9(B)(d) specifically states that "Carlos hereby irrevocably agrees that such provision is fair and reasonable in light of such circumstances." Teran agrees that his former ACTP shares are now worth nothing, further belying his claim that the $1.00 purchase price was shocking or offensive.

In his surreply, Teran suggests for the first time that he was essentially forced into the Shareholders Agreement because there was unequal bargaining power as between him and the other ACTP shareholders because he was a minority shareholder in a company being merged into ACTP.  Teran testified that he had "no choice" but to sign the Shareholders Agreement, and alleges he did not have sufficient time to review the terms of the Agreement before he signed it. Teran also testified, however, that prior to executing the Shareholders Agreement, he understood he was taking a risk because he would have no guaranteed minimum buy-out price for his shares, and chose to enter into the Agreement anyway.[50]  Even if Teran was in an unequal bargaining position with Defendants, however, such an unequal bargaining position alone is not enough to find a contract term unconscionable.  Before a contract will be deemed unconscionable, there

_____

[50]Doc. 164, Ex. A.

must also be "some type of deceptive practice associated with the term."[51]  Teran does not allege any deceptive practices associated with inclusion of the Call Right in the Shareholders Agreement.  Accordingly, the Court finds that the Call Right provision does not create an unconscionable contract term.

### 2.    Prior Breach

The parties agree that in general, a party who first commits a material breach cannot enforce the contract.[52]  Teran contends that GB Miami committed a "prior breach" of the Shareholders Agreement, thus discharging his obligation to relinquish his shares based on GB Miami's exercise of its Call Right.  As GB Miami points out, however, Teran has not alleged any prior breach by GB Miami; instead, Teran alleges that GB International breached the Shareholders Agreement by making modifications to a supply agreement between GB International and ACTP "without adher[ing] to the procedure set forth in Section 1.3[b] of the Shareholders Agreement."  Teran contends that GB International's prior breach should essentially be imputed to GB Miami because the two corporations are "one in the same," and because "there is no evidence to show that GB Miami opposed any action taken by [GB International] to improperly amend the Supply Agreement."  Teran does not cite to evidence in the record nor offer any legal authority to support his claim that GB Miami is bound by GB International's purported breach.  Moreover, as GB Miami notes, Section 1.3(b) of the Shareholders Agreement applies to modifications or amendments to the supply agreement "by

---

[51]*Adams*, 774 P.2d at 357; *Aves ex rel. Aves v. Shah*, 906 P.2d 642, 652–53 (Kan. 1995) ("[U]nequal bargaining position alone is not enough to find a contract unconscionable . . . there must be some type of deceptive practice associated with the term.").

[52]*See* Williston on Contracts, 4th ed., § 63:3.

the Company," which the Shareholders Agreement expressly defines as ACTP. Teran's surreply

does not address the issue raised by GB Miami questioning whether it is possible for GB

International to breach this section that expressly applies to the actions of ACTP. Accordingly,

the Court enters summary judgment in favor of GB Miami on Teran's prior breach defense.

### 3.     Unclean Hands

Under the "unclean hands" doctrine, a court of equity may deny relief to a party whose

conduct has been inequitable, unfair and deceitful, but it applies only when the reprehensible

conduct complained of pertains to the controversy at issue.[53] The doctrine is applied sparingly,

in very limited situations.[54] In his surreply brief, Teran argues for the first time that GB Miami

has unclean hands with respect to the exercise of its Call Right because GB Miami

"manufacture[d] circumstances" that essentially forced Teran to resign from ACTP, thus

triggering the Call Right. In support of this claim, Teran cites to his deposition testimony that

GB International acted for its own benefit and the benefit of a related company, CGR, which

caused damage to ACTP and diminished the value of the company, which in turn, caused him to

leave ACTP. It is uncontroverted, however, that when Teran ended his employment with ACTP,

he did so voluntarily.[55] Teran testified that he left ACTP voluntarily, "but after a year of

negotiations of trying to save a situation," and that he "had to sever his employment with

[ACTP] in order to cut my losses short."[56] Teran further testified that representatives of the

---

[53]*Boucek v. Boucek*, 305 P.3d 597, 603–04 (Kan. 2013) (citing *Goben v. Barry*, 676 P.2d 90, Syl. ¶ 3 (Kan. 1984)).

[54]*Sunflower Bank, N.A. v. Airport Red Coach Inn of Wichita, L.L.C.*, 173 P.3d 883 (Table) (Kan. Ct. App. 2008).

[55]Doc. 129 at 5, ¶ 12.

[56]*Id.*, Ex. A at 5:17–7:16.

company tried to persuade him to stay in some capacity even after he resigned.[57]

Even if the Court accepts as true Teran's allegations that GB Miami and GB International harmed ACTP through alleged control of ACTP's operations, Teran does not point the Court to any evidence in the record that such control was calculated to force him to resign or that he was somehow duped into resigning from ACTP so that GB Miami could exercise its Call Right. Indeed, Teran conceded that he was advised of the consequences of his resignation prior to the effective date, but did not pay attention to the letter from ACTP. The Court finds that the unclean hands doctrine does not apply to this situation.

### 4. Waiver

Finally, Teran contends that GB Miami waived its Call Right "by allowing ACTP to enter into the new employment agreement with Teran on October 29, 2010." Under Kansas law, a waiver is an intentional relinquishment of a known right and intention may be inferred from conduct.[58]

As both parties note, the letter agreement setting forth Teran's new employment makes no mention of GB Miami's Call Right under the Shareholder's Agreement. By contrast, the letter agreement specifically states that the non-compete provision in Section 9 of the Carlos Employment Agreement would remain in effect. Thus, Teran argues, by specifically providing that the non-compete would remain in effect, while not mentioning the Call Right, it is "readily apparent GB Miami gave up the Call Right under Section 2.9(B)(d) of the Shareholders Agreement when ACTP entered into the new employment agreement with Teran."

---

[57]*Id.* at 17:6–18:10.

[58]*First Nat'l Bank of Omaha v. Centennial Park, LLC*, 303 P.3d 705, 714–15 (Kan. Ct. App. 2013) (citing *Iola St. Bank v.Biggs*, 662 P.2d 563, 571 (Kan. 1983)).

The Court disagrees.  It is not clear how the Court can infer an intent by GB Miami to waive its Call Right in the Shareholders Agreement because ACTP entered into a new employment agreement with Teran—clearly, GB Miami was not a party to the new employment agreement.  Although he offers no authority in support of his argument, Teran appears to suggest that ACTP's conduct in entering into the new employment agreement with Teran should be imputed to GB Miami because GB Miami selected some of ACTP's board members and was thus part of ACTP's management. To the extent Teran is attempting to argue that the corporate veil between ACTP and GB Miami should be pierced, however, he falls short of establishing that either corporation is the alter ego of the other.[59]  While Teran contends that GB Miami, along with GB International, collectively had the right to appoint four persons to ACTP's board of directors, he makes no attempt to show that the two separate corporate entities are so intermingled so that recognition of them as separate entities "would result in an injustice to third parties."[60]  Teran's waiver defense is without merit.

Teran further argues that if GB Miami wanted to maintain the Call Right, it needed to include a specific reference to that right in the new employment agreement or execute an amendment of the Shareholders Agreement to reflect that the Call Right would apply to the new employment agreement.  Teran continues to assert that the new employment agreement with ACTP effectively undid his resignation and the triggering of GB Miami's Call Right.  Teran's affirmative claims for declaratory judgment and breach of the Shareholders Agreement have been denied, and thus his claim of waiver on these grounds is also without merit.

---

[59]*See Dean Operations, Inc. v. One Seventy Assoc.*, 896 P.2d 1012, 1016–17 (Kan. 1995) (discussing factors the court considers when evaluating whether to disregard the corporate entity (citation omitted)).

[60]*Id.* at 1012.

The Court finds nothing in the record to support that GB Miami either made statements or took action consistent with abandoning its Call Right.  In the August 5, 2010 letter accepting Teran's resignation, ACTP explained that GB Miami's Call Right had been triggered.  Shortly after the execution of the new employment agreement, on December 1, 2010, GB Miami and ACTP sent Teran notice that GB Miami had exercised its Call Right based on Teran's resignation of the Carlos Employment Agreement, tendering the $1.00 payment amount called for in the Shareholders Agreement.  GB Miami was not a party to the new employment agreement, nor is there evidence that it somehow "allowed" ACTP and Teran to enter into the new agreement.  Summary judgment is entered in favor of GB Miami on this defense.

Accordingly, the Court grants GB Miami summary judgment on its counterclaim.  The Court finds as a matter of law that GB Miami properly exercised its  under Section 2.9(B)(d) of the Shareholders Agreement and that Teran ceased to own any shares in ACTP when it tendered the contractually-mandated $1.00 purchase price to Teran on December 1, 2010.[61]

### C.      Counts I and II—Derivative Claims

In Counts I and II, Teran asserts tort claims derivatively on behalf of ACTP based on the allegation that GB International and GB Miami, as majority shareholders of ACTP, harmed the company through their alleged control of ACTP's decision-making.  Defendants contend that because GB Miami properly exercised its Call Right to purchase all of Teran's shares in ACTP, he is no longer a shareholder in ACTP and thus has no standing to pursue his derivative claims.  As previously held in the Court's order addressing Defendants' motion to dismiss, Missouri law

---

[61]The Court does not reach GB Miami's alternative claim that it properly exercised its second Call Right in May 2013.

applies to Teran's tort claims, to the extent the causes of action alleged derivative claims.[62]

Because Teran's derivative claims continue to be based on the purported mis-governance of

ACTP, a Missouri corporation, the Court applies Missouri substantive law regarding shareholder

derivative actions.[63]

 Under Missouri law, an individual cannot maintain a derivative action on behalf of a

corporation if that person is no longer a shareholder in the corporation.[64]  Here, Teran was

deprived of his shareholder status when GB Miami exercised its Call Right and ACTP tendered

the contractually required payment of $1.00 on December 1, 2010.  The fact that Teran refused

to return his stock certificates as requested is of no consequence.[65]  Accordingly, Teran's status

as a shareholder, and the concomitant right to bring a shareholder derivative action, ended on

December 1, 2010, when GB Miami exercised its Call Right under Section 2.9(B)(d) of the

Shareholders Agreement.  Thus, the Court agrees with Defendants that Teran lacks standing to

maintain his derivative claims on behalf of ACTP.

---

[62]Doc. 73 at 13.

[63]*See Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 337 F. Supp. 2d 1243, 1250 (D. Kan. 2004) ("The generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and liabilities of its officers, stockholders, and directors.") (quotation omitted).

[64]*See Schwartz v. Custom Printing*, 926 S.W.2d 490, 494 (Mo. Ct. App. 1996) (holding that plaintiff's "standing as a shareholder—and the concomitant right to bring a shareholder derivative action—was abolished" as of the date plaintiff lost his shares); *K-O Enters., Inc. v. O'Brien*, 166 S.W.3d 122, 130 (Mo. Ct. App. 2005) (holding that shareholder "lost his standing to bring [a derivative] suit as of the date he was no longer a shareholder" of the corporation).

[65]*See Missouri ex rel. Gundaker v. Davis*, 932 S.W.2d 885, 887 (Mo. Ct. App. 1996) (explaining that a stock certificate is evidence of title to stock, but is not the stock itself); *Kaiser v. Moulton*, 631 S.W.2d 44, 48 (Mo. Ct. App. 1981) ("It has long been held in Missouri that a share of stock is the actual property of the shareholder, an intangible property in the nature of a chose in action; the certificate of stock is a 'muniment of title.' Title to the shares may exist without the stock certificate, which is only evidence of the shareholder's property interest.") (quotation omitted).

Teran urges that, even if the Court holds he is no longer a shareholder, an "equitable shareholder exception" should apply to allow him to proceed with his derivative claims.  Teran relies on *Eastwood v. National Bank of Commerce*, for the proposition that a plaintiff who has lost his technical shareholder status in a transaction permeated by fraud is an "equitable" shareholder, with standing to sue derivatively.[66]  In that case, plaintiffs alleged federal securities violations as well as state law claims for fraud, conversion, and breach of contract.  The court addressed Defendants' argument that former shareholders could not maintain a derivative action, and held that when a derivative suit is brought under federal law, substantive federal law or policy determines whether a plaintiff has shareholder status within the meaning of Fed. R. Civ. P. 23.1, which requires a plaintiff suing derivatively to be a shareholder at the time of the transaction of which he complains.[67]  In finding the plaintiff had standing as an "equitable shareholder" to sue derivatively, the court noted that

> the Tenth Circuit has not been hesitant to find that a plaintiff who has lost his technical shareholder status in a transaction permeated by fraud is an "equitable" shareholder, with standing to sue derivatively . . . at least where the plaintiff seeks to set aside the fraudulent transaction in which he lost his technical or legal shareholder status.[68]

The court further explained,

> [c]onferring equitable shareholder status upon a shareholder who is, in the same suit in which he asserts derivative claims, challenging the very transaction by which he allegedly lost his shareholder status, which transaction is alleged to have been induced by the same conduct which caused the loss to the

---

[66]673 F. Supp. 1068, 1077 (W.D. Okla. 1987).

[67]*Id*. at 1076.

[68]*Id*. at 1077 (collecting cases).

> corporation for which the derivative claim is asserted, does not
> derogate the policy said to be served by the shareholder status
> requirements of [Rule] 23.1.[69]

As previously noted, Teran's derivative claims are governed by Missouri state law, not federal law. Teran does not cite, nor could the Court locate, any Missouri cases that recognize the "equitable shareholder" exception. But even assuming that Missouri recognized this exception, it is not applicable to this case. As the court in *Eastwood* explained, this exception applies where the transaction that caused the loss of shareholder status is the subject of a claim of fraud.[70] Teran does not assert any fraud claim nor allege any fraud by Defendants, particularly with respect to GB Miami's exercise of its first Call Right. In fact, as Defendants point out, Teran has not alleged fraud of any sort in connection with exercise of the Call Right, but contends that the triggering event for the Call Right—termination of the Carlos Employment Agreement—did not occur, or was subject to various affirmative defenses. As the Court has determined, GB Miami properly exercised its first Call Right and there is no basis to set aside that transaction.

Finally, Teran argues that if the Court determines he lacks standing on his derivative claims, he should be granted leave to amend his claims for breach of fiduciary duty and tortious interference with business relationships to assert individual claims. Without providing any specifics, Teran now asserts that he has "new individual claims [that are] different from and not duplicative of the claims this Court found to be derivative" in granting the motion to dismiss, and if summary judgment is granted on the basis that he cannot maintain his claims since he is

---

[69] *Id.*

[70] *Id.*

no longer a shareholder of ACTP, he should be granted leave to bring individual claims.

The Pretrial Order in this matter entered on August 28, 2014,[71] supersedes all pleadings and controls the subsequent course of the case.[72]  "When an issue is set forth in the pretrial order, it is not necessary to amend previously filed pleadings" because "the pretrial order is the controlling document for trial."[73]  The Tenth Circuit has explained that an attempt to add a new claim to the pretrial order is "the equivalent of asking leave to amend [the] complaint, and must be evaluated by the court under the standards set forth in Rule 15(a)."[74]  Here, Teran seeks to effectively modify the Pretrial Order by restoring his tort claims as individual claims, which were dismissed by the Court before the Pretrial Order was entered.[75]  Under Rule 15(a), leave to amend a complaint is freely given when justice so requires.[76]  A party is typically granted leave to amend under this rule unless there is "a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendment previously allowed, or futility of amendment."[77]  A proposed amendment is futile if the amended

---

[71]Doc. 155.

[72]*See* Fed. R. Civ. P. 16(e); D. Kan. Rule 16.2(b).

[73]*Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006); *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (quoting *Expertise Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir. 1987); Fed. R. Civ. P. 16(e)).

[74]*Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1285 (10th Cir. 2006); *Minter*, 451 F.3d at 1204; *see Hunter v. Buckle, Inc.*, 488 F. Supp. 2d 1157, 1170 (D. Kan. 2007).

[75]Doc. 73.

[76]Fed. R. Civ. P. 15(a)(2).

[77]*Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005).

complaint would be subject to dismissal.[78]

Undue delay alone is sufficient to deny a motion to amend; there need not be a showing of prejudice.[79]  Moreover, motions for leave to amend are correctly denied when it appears that the plaintiff is using Rule 15 to make the complaint "a moving target" to "salvage a lost case by untimely suggestion of new theories of recovery," present "theories seriatim" in an effort to avoid dismissal, or to "knowingly delay [] raising [an] issue until the eve of trial."[80]  While liberality of  amendment is important, it is equally important that "there must be an end finally to a particular litigation."[81]  The value of summary judgment procedure "would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should that theory prove unsound, come back along thereafter and fight on the basis of some other theory."[82]

Teran's request is not well-taken.  The Court disagrees with Teran's characterization of Defendants' position as somehow a "gotcha" tactic—it has always been Defendants' position that when GB Miami exercised its first Call Right in December 2010, Teran was no longer an ACTP shareholder and thus lacks standing to pursue derivative claims on ACTP's behalf.[83]  The Court extensively analyzed the nature of Teran's tort claims in its order on Defendants' motion

---

[78] *Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1288 (10th Cir. 2008).

[79] *See, e.g., Cuenca v. Univ. of Kan.*, 205 F. Supp. 2d 1226, 1229–30 (D. Kan. 2002).

[80] *Minter*, 451 F.3d at 1206 (quoting *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 800 (10th Cir. 1998); *Hayes v. Whitman*, 264 F.3d 1017, 1027 (10th Cir. 2001); *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994)).

[81] *Pallottino*, 31 F.3d at 1027.

[82] *Id.* (citations omitted).

[83] *See* Docs. 56, 71.

to dismiss, discussing the differences between claims brought derivatively and individually.[84]

Because Teran's tort claims only sought recovery for alleged harm to ACTP, the Court held they

must be brought derivatively and granted Defendants' motion to dismiss, without prejudice to

seek leave to amend.  The Court did not limit Teran's amended claims to derivative claims;

nothing prevented him from amending to allege direct individual damages or harm, instead of

indirect damages by virtue of loss of value of his ACTP stock.  Teran does not explain his failure

to assert amended individual damage claims, and any proposed amendment at this stage of the

proceedings is not based on new evidence unavailable at the time of the original amendment.

Instead, it appears that Teran seeks to propose a theory that he did not choose to advance until

after his primary theory had been dismissed.

The Court has determined that GB Miami properly exercised its Call Right to purchase

all of Teran's shares in ACTP in December 2010.  Teran thus lacks the requisite standing to

pursue his derivative claims.  Defendants are granted summary judgment on Counts I and II.

### D.    Count V Breach of Shareholders Agreement

In Count V, Teran asserts a claim for breach of Section 1.3(b) of the Shareholders

Agreement against GB International and ACTP based on the allegation that they unilaterally

modified a supply agreement that the Agreement states can only be modified with the consent of

ACTP's board of directors and the Continuing Shareholders.[85]  This claim is asserted directly by

Teran, and alleges that through their unilateral modifications of this supply agreement, GB

International and ACTP imposed various restrictions on ACTP's ability to buy and sell parts,

---

[84]Doc. 73 at 14–17.

[85]Count V was also asserted in the First Amended Complaint, and dismissed without prejudice after Teran
acknowledged that the claim should be more particularly plead. Doc. 73 at 12.

thus making ACTP less attractive to customers, damaging ACTP's business, and decreasing the value of its stock.  The parties agree that this breach of contract claim is governed by Kansas law, as stated in the Shareholders Agreement.[86]

GB International argues that Teran's breach of contract claim fails to allege a contract provision that could have been breached by GB International.[87]  The Court agrees.  By its plain terms, Section 1.3(b) only applies to "the Company," which is expressly defined under the Shareholders Agreement to mean ACTP.  Section 1.3(b) does not apply to GB International, and thus it could not have breached that provision of the Agreement and it cannot be a valid basis for Teran's claim for breach of contract against GB International.  "A breach of contract occurs when there is a failure of performance of a duty arising or imposed by agreement."[88]

Teran's argument that the introductory portion of Section 1.3 effectively removes "the Company" from paragraph (b)'s description of the decision requiring consent is unavailing. Teran contends that the language that the decisions enumerated in Section 1.3 "shall require the consent of the Board of Directors and the Continuing Shareholders" changes paragraph (b) to mean that "any" amendment or modification to the Supply Agreement requires consent of the Board and Continuing Shareholders.  But that is not what Section 1.3(b) states and the Court will

---

[86]Doc. 155 at 3.

[87]This issue was raised by GB Miami in a Motion to Dismiss that Teran opposed and was pending when Defendants moved for summary judgment.  Docs. 107, 108, 117, 118. The Court summarily found the motion to dismiss moot on the assumption that the issues raised overlapped with those raised on summary judgment. Doc. 128. The Court has revisited that ruling and will consider the issue raised by GB International at this time, as it involves construction of a contract provision as a matter of law.  *See Moses H. Cone Mem'l. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 & n.14 (1983) (holding that "every order short of a final decree is subject to reopening at the discretion of the district judge."); Fed. R. Civ. P. 54(b) (providing that until the court expressly directs entry of final judgment, an order that resolves fewer that all the claims among all of the parties "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.").

[88]*Nw. Ark. Masonry, Inc. v. Summit Specialty Prods., Inc.*, 31 P.3d 982, 985 (Kan. Ct. App. 2001) (citing *Hunt v. KMG Main Hurdman*, 839 P.2d 45, Syl. ¶ 2 (Kan. Ct. App. 1992)).

not read the contract to have the effect Teran claims it has.  "When the terms of the contract are plain and unambiguous the meaning must be determined by its contents alone and words cannot be read into the agreement which import an intent wholly unexpressed when it was executed."[89]

Thus, Count V is limited to a breach of contract claim against ACTP.  Defendants urge that Count V is merely a "re-packaging" of Teran's derivative tort claims, and is invalid as a matter of law because it is also derivative in nature—since Teran is not a shareholder in ACTP, he has no standing to pursue derivative claims on ACTP's behalf.  Defendants argue that Count V only seeks recovery for harm to ACTP, specifically: Defendants' actions were "detrimental to ACTP," "led to the loss of sales and profits for ACTP," "caused ACTP to lose a great deal of money," made "ACTP less attractive to customers," made "ACTP's profit margin shr[i]nk dramatically," and caused "ACTP to continuously lose money."  The only damages Teran seeks in this claim stem from an alleged decrease in the value of his former ACTP shares as a result of alleged harm to ACTP.

Although the parties agree that Kansas law controls the breach of contract claim in Count V, they do not address whether Missouri law applies to the extent the claim involves corporate governance.  Nevertheless, the general law regarding determination of whether a claim is derivative is similar in both states.  Both state courts have established the general rule that a corporate shareholder may not bring an action in his or her own name to recover for wrongs done to the corporation or its property.[90]  This is because the injury flowing from such breach is to the

---

[89]*Wood v. Hatcher*, 428 P.2d 799, 804 (Kan. 1967).

[90]*See Lightner v. Lightner*, 266 P.3d 539, 547 (Kan. Ct. App. 2011); *Cook v. Cook*, 143 S.W.3d 709, 711 (Mo. Ct. App. 2004).

corporation, *i.e.*, to the shareholders collectively, and not to the shareholders individually.[91]

"Whether a suit may be brought as an individual action or only as a derivative suit on behalf of

the corporation turns on whether the plaintiff has suffered an injury distinct from that suffered by

the corporation."[92]

Teran responds that the Shareholders Agreement sets forth minimum buyout prices for

the shares of other ACTP shareholders and thus, the alleged harm to ACTP does not affect all

shareholders equally.  Teran argues that unlike him, the Call Rights for the Continuing

Shareholders had minimum value guarantees, and thus Defendants could "systematically destroy

the value of ACTP and cause harm to Teran," separate and distinct from other shareholders.

Teran cites no authority for his position, which is at odds with the test for determining when a

claim is derivative.  The test is not whether all of ACTP's shareholders have been injured to the

same extent, or even whether all shareholders have been damaged; instead, the test is whether

the damages at issue are only indirectly sustained by the stockholder as a result of injury to the

corporation.[93]  Here, Teran does not dispute that the only harm he alleges in Count V is harm to

the value of his former shares in ACTP, which resulted because of harm to ACTP as a whole.

Because Teran has not demonstrated that he can prevail on Count V without showing an injury

to ACTP, his breach of contract claim is derivative.  And, because Teran is not a shareholder of

---

[91]*Lightner*, 266 P.3d at 547–48; *Clockwork Home Servs., Inc. v. Robinson*, 423 F. Supp. 2d 984, 990 (E.D. Mo. 2006) (citing *Dawson v. Dawson*, 645 S.W.2d 120, 125 (Mo. App. 1982)).

[92]*Arent v. Distrib. Sciences, Inc.*, 975 F.2d 1370, 1374 (8th Cir. 1992) (citation omitted); *Lightner*, 266 P.3d at 547 ("[T]he inquiry should be whether the stockholder has demonstrated that he or she has suffered an injury that is not dependent on an injury to the corporation.") (quoting *Tooley v. Donaldson, Lufkin & Jenrette*, 845 A.2d 1031, 1036 (Del. 2004)).

[93]*See Lightner*, 266 P.3d a 548 (citing *Tooley*, 845 A.2d at 1036; *Clockwork Home Servs*, 423 F. Supp. 2d at 992 n.7).

ACTP, he lacks standing to pursue this claim.

As with Counts I and II, Teran asks that should the Court determine Count V is derivative, he should be granted leave to amend to add a claim for individual harm under the same legal theories upon which Count V is based.  For reasons set forth with respect to his request to amend his derivative claims, Teran's request is denied—any proposed amendment is made on a theory of recovery not advanced until the primary theory had been dismissed. Defendants are granted summary judgment on Count V.

### E.      Attorneys Fees

GB Miami also seeks an award of attorneys fees and costs incurred in enforcing its contractual rights under the Shareholders Agreement.  Section 5.1 of the Agreement states: "[A] party that prevails in any such enforcement of the terms and provisions of this Agreement shall be reimbursed by the non-prevailing party(ies) for all costs and expenses, including legal fees, which it may incur in pursuing such enforcement."  Kansas law enforces these types of contract terms.[94]  Because GB Miami's counterclaim and Teran's claims for declaratory judgment and breach of contract constitute actions to enforce the terms and provisions of the Shareholders Agreement, it is entitled to reasonable attorneys' fees and costs incurred in pursuing its counterclaim and defending against Teran's claim.  GB Miami, however, has not yet submitted evidence to establish their reasonable attorneys' fees.  Therefore, GB Miami shall submit sufficient evidence to establish its reasonable attorneys' fees and costs by April 16, 2015; Teran shall respond to that evidence by May 7, 2015; and GB Miami may file a reply by May 21, 2015.

---

[94]*See Farmers Cas. Co. v. Green*, 390 F.2d 188, 192 (10th Cir. 1968) (holding that, under Kansas law and traditionally, attorneys' fees can be awarded only if provided by contract or authorized by statute).

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 124) is GRANTED on all counts of Plaintiff's Second Amended Complaint;

**IT IS FURTHER ORDERED** that Defendant GB Miami is also GRANTED summary judgment on its counterclaim, declaring that GB Miami properly exercised its Call Right in December 2010, and awarding GB Miami its costs and attorneys' fees; GB Miami shall submit sufficient evidence to establish its reasonable attorneys' fees and costs by April 16, 2015; Teran shall respond to that evidence by May 7, 2015; and GB Miami may file a reply by May 21, 2015;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Extension of Time to Conduct Discovery (Doc. 156) is DENIED as moot.

**IT IS SO ORDERED.**

Dated: March 26, 2015

                                     S/ Julie A. Robinson

                                     JULIE A. ROBINSON

                                     UNITED STATES DISTRICT JUDGE